David N. Lake, Esq., State Bar No. 180775
**LAW OFFICES OF DAVID N. LAKE**
  **A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Telephone: (818) 788-5100
Facsimile: (818) 788-5199
david@lakelawpc.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE VLADIMIR GUSINSKY LIVING TRUST, | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDERS' DERIVATIVE COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| STEPHEN BERMAN, an individual; MICHAEL G. MILLER, an individual; MURRAY L. SKALA, an individual; ROBERT E. GLICK, an individual; MARVIN ELLIN, an individual; DAN ALMAGOR, an individual; LEIGH ANNE BRODSKY, an individual; and PETER F. REILLY, an individual; | |
| Defendants. | |
| --and-- | |
| JAKKS PACIFIC, INC., | |
| Nominal Defendant. | |

Plaintiff, The Vladimir Gusinsky Living Trust ("Plaintiff"), by its attorneys, allege this shareholders' derivative complaint against the individual defendants (the "Individual Defendants") named herein.  The allegations are asserted on information and belief after due investigation, except as to those matters which relate to Plaintiff and its own acts, which are asserted on personal knowledge.

## NATURE OF THE ACTION

1.     This is a shareholders' derivative action (the "Action") brought for the benefit of nominal defendant JAKKS Pacific, Inc. ("JAKKS" or the "Company") against certain present and former members of JAKKS' Board of Directors. Plaintiff seeks to recover damages inflicted upon JAKKS by their actions in connection with: (1) the imposition of a Shareholder Rights Agreement (also known as a "poison Pill"); and (2) an $80 million stock repurchase, which severely damaged JAKKS' balance sheet and its ability to effectively compete in the toy market, and that had no purpose other than deflecting a premium buy-out offer and entrenching the Board.

2.     JAKKS is a company which manufactures, distributes, and sells children's toys.  In 2011, JAKKS reported disastrous financial results, as it found itself having trouble competing with better financed competitors such as Hasbro and Mattel.  The stock closed as low as $12.84 per share on January 6, 2012. It would not have closed even that high except for the fact that the stock price was buoyed by a $20 per share takeover overture from activist investor Oaktree Capital Management, LP ("Oaktree"), first announced in September 2011. The stock had not traded at $20 per share since 2008, and any such offer would reflect a healthy premium. Despite JAKKS' poor prospects, this overture was repeatedly rebuffed. From October 2011 to at least August 2012, the Board rejected a buy-out of the Company, claiming that JAKKS' business plan would yield higher value to shareholders. Subsequent events showed that the Board had no such realistic plan, as JAKKS continued business as usual, and losses cascaded.

3.      In March 2012, when another activist shareholder, the Clinton Group, Inc. (the "Clinton Group") publicly announced its support for Oaktree in its effort to maximize shareholder value, the Board quickly bought the Clinton Group off, to the severe detriment of JAKKS and its shareholders.  To accomplish this, Defendants caused JAKKS to enter into an April 22, 2012 standstill agreement with Clinton Group, Inc. (the "Standstill Agreement").  This Standstill Agreement revolved around a promise by JAKKS to the Clinton Group to repurchase JAKKS shares (the "Defensive Repurchase"). The Company thus agreed to repurchase 4 million of its shares at $20 per share.  This was approximately 15% of its outstanding shares.  The Defensive Repurchase, which closed on July 5, 2012, cost the Company $80 million it could not afford to spend, given its need to develop and advertise new toy products.[1]  The Standstill Agreement also provided that JAKKS was to afford Oaktree due diligence and negotiate with Oaktree in good faith.  Oaktree continued to seek due diligence from Oaktree in the summer of 2012 and in August, 2012 Clinton sent a letter to the JAKKS Board stating the Directors were in breach of the Standstill Agreement as they were refusing to negotiate in good faith with Oaktree or permit Oaktree due diligence.

4.      The Defensive Repurchase was made to mollify the Clinton Group, and prevent it from teaming up with Oaktree to launch a proxy contest that could oust the Board members. The Clinton Group posed a serious "threat" to the Board members.  Clinton Group is an activist hedge fund known for pressuring companies into making strategic changes to raise shareholder value, including through proxy contests to oust directors.  Indeed, the Clinton Group had previously gone after bedmaker Select Comfort Corp. and fast-food franchiser Red Robin International

---

[1]    Reflecting the Board's desperation to stay in office at any costs, the Board bound JAKKS to carry out the Defensive Repurchase, without employing a clause that would allow these fiduciaries to cancel forever the Defensive Repurchase if it appeared to be wasteful of corporate assets or otherwise injurious to the Company.

Inc.  The JAKKS Board, which owned relatively little JAKKS stock, could easily have been ousted if the Clinton Group chose to wage a proxy contest.  Many of JAKKS shares are owned by institutions.  As reflected in JAKKS 2011 Proxy Statement, all of the JAKKS Directors and Officers owned approximately 1.8% of JAKKS shares.  On the other hand, four large institutions owned approximately 37% of the Company's shares and could be amenable to monetizing their holdings, or otherwise realizing higher value, in a resulting sale of the Company or by new business methods adopted following a change in the JAKKS Board.

5.      As a result of Standstill Agreement and the Defensive Repurchase, the Company was forced to incur substantial debt to fund the Defensive Repurchase and to buy JAKKS shares at an unduly high price.  JAKKS was forced to fund the Repurchase by incurring debt because much of its balance sheet cash was held abroad and unavailable for use in the United States, absent the payment of taxes required to repatriate the cash. Thus, JAKKS' practical ability to spend cash domestically was very limited.  While JAKKS does not consolidate its domestic and foreign operations for tax purposes, it does so for reporting purposes. It has not disclosed the amount of cash and cash equivalents which would be subject to a repatriation tax but it was finally made clear in an October 23, 2012  Investors' Conference (the "October Investors' Conference") that the amount was very significant.[2]

6.      Contrary to their fiduciary duties to advance the interests of JAKKS regardless of their self-interest, directors Almagor, Berman, Ellin, Glick, Miller, Reilly and Skala (the "Repurchase Defendants") literally used corporate funds *to pay Clinton Group not to oust the entrenched Board members from office.*  As a

---

[2]      In furtherance of its entrenchment plan, the Board also adopted a poison pill (the "Poison Pill") in March 2012 without shareholder approval.  This, too, worked to unreasonably hinder the Clinton Group and Oaktree, and entrench the Board.  The Poison Pill generally prohibited anyone, without prior Board consent, from acquiring more than 10% of the Company's shares.

consequence of the Defensive Repurchase, JAKKS (all in the course of less than two years) has been unable to spend competitive sums to develop and market new products; has borrowed even more heavily; has issued $100 million in convertible notes at low conversion prices which exert downward pressure on the stock; and has fallen to the range of $6-7 per share.  Although JAKKS has a market value of only $180 million, the machinations of its Board have cost its investors roughly $300 million, based on the difference between the current market price and what the investors could have had if JAKKS had accepted a $20 bid in mid-2012.  The Board was not acting reasonably and rationally; it was acting defensively, and to entrench itself.

7.      This conduct violated the *Unocal* Rule which prohibits a corporate Board from entrenching itself through disproportionate and unreasonable measures that are contrary to the best interests of the company.  *See Unocal Corp. v. Mesa Petroleum*, 493 A.2d 946 (Del. 1985).

8.      In sum, the claims for damages arising out of the wrongful Defensive Repurchase and the SRA are brought against present and former directors Almagor, Berman, Ellin, Glick, Miller, Reilly and Skala (the "Repurchase Defendants"). These claims are brought under state law for violation of the *Unocal* standard. Additional allegations relating to the breach of the Standstill Agreement which led to further acts of entrenchment as described herein, are brought against these defendants, and defendant Brodsky.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter over the Plaintiff pursuant to 28 U.S.C. §1332 (diversity jurisdiction).   As to such diversity jurisdiction, Plaintiff is a citizen of Illinois while each defendant was at the time of filing a citizen of a state other than Illinois.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  A number of the claimed wrongful acts and practices asserted herein occurred in this District.

**PARTIES**

11.     Plaintiff The Vladimir Gusinsky Living Trust has held JAKKS shares since 2006, and continues to hold JAKKS shares.  It is a citizen of Illinois.

12.     Defendant JAKKS is a Delaware corporation with its principal executive offices located at 22619 Pacific Coast Highway, Malibu, California 90265, Los Angeles County.  Its common stock trades on the NASDAQ under the ticker symbol "JAKK."  JAKKS develops, produces, and markets toys and consumer products in the United States and internationally.

13.     JAKKS operates in two segments, Traditional Toys and Electronics; and Role Play, Novelty and Seasonal Toys. The Company offers action figures and accessories primarily based on Monsuno, Batman, Ultimate Fighting Champion, Total Non-Stop Action wrestling, and Pokémon franchises; Toy vehicles comprising Road Champs, Fly Wheels, and MXS toy vehicles and accessories; and electronics products under the SpyNet spy products, EyeClops Bionic Eye products, Laser Challenge, and Plug It In & Play TV Games based on Disney and other brands. It also offers small, large, fashion, and baby dolls based on Disney Princess, Disney Fairies, Cabbage Patch Kids, Hello Kitty, Graco, and Fisher Price brands; private label products; and pet products, which comprise toys, consumables, and accessories under the JAKKS Pets, Kong, and American Classics brand names.  In addition, the Company offers food play and activity kits under the Creepy Crawlers and BloPens brands; and role play, dress-up, pretend play, and novelty products for boys and girls based on Black & Decker, McDonalds, Dirt Devil, Disney Princess, Disney Fairies, and Dora the Explorer, as well as on its proprietary brands.  Further, it offers indoor and outdoor kids furniture, activity trays and tables, and room décor; kiddie pools and seasonal and outdoor products based on Crayola and Disney characters;

Funnoodle pool floats; and Halloween and everyday costumes under the Spiderman, Iron Man, Toy Story, Sesame Street, Power Rangers, Hasbro, and Disney Princess brands, as well as Halloween accessories.

14.     Defendant Stephen G. Berman ("Berman") is, and has been, the Company's Chief Executive Officer and President, and a member of the Company's Board of Directors (the "Board") at all relevant times.  He has been the corporate Secretary and a director since he co-founded JAKKS in January 1995.  From January 1, 1999 he served as President.  From February 17, 2009 through March 31, 2010 he was also Co-Chief Executive Officer and since April 1, 2010 he has been Chief Executive Officer. Berman s named as a defendant herein for his acts undertaken: (a) as a director; and (b) as an officer.   Berman is a citizen of California.

15.     Defendant Murray L. Skala ("Skala") has been a director since October 1995.  Since 1976, Skala has been a partner in the law firm Feder Kaszovitz LLP (f/k/a Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP), the Company's outside counsel.  Skala is a citizen of New York.

16.     Defendant Robert E. Glick ("Glick") was a director from October 1996 to December 19, 2014.  Glick is a citizen of New York.

17.     Defendant Marvin Ellin ("Ellin") was a director from October 2010 through December 6, 2013.  Ellin is a citizen of New York.

18.     Defendant Michael G. Miller ("Miller") was a Director from February 1996 to December 19, 2014.

19.     Defendant Dan Almagor ("Almagor") was a director from September 2004 through December 26, 2012.

20.     Defendant Leigh Anne Brodsky ("Brodsky") was a director from May 8, 2012 through December 6, 2013.

21.     Defendant Peter F. Reilly ("Reilly") has been a JAKKS director since April 21, 2012.  Reilly was brought on the Board at the time of the Standstill Agreement, was a Clinton nominee and as a director ratified and effectuated the

wrongful Defensive Repurchase. Reilly was a director at the time of the Board's wrongful refusal to negotiate with Oaktree in good faith in August 2012 as required by the Standstill Agreement, and may be held liable therefor.

22.     Non-employee Directors are very well compensated by JAKKS.   In addition to an annual cash stipend of $75,000, payments to committee chairs and the members of the audit committee total $30,000 and $15,000 respectively; payments to the chair of the compensation committee and the nominating and governance committee total $15,000 and each member of such committees receives an annual fee of $10,000. There is also an annual grant of restricted common shares to each Director in the amount of $100,000.

## SUBSTANTIVE ALLEGATIONS

## I.    THE BOARD BREACHES ITS FIDUCIARY DUTY THROUGH AN ENTRENCHMENT SCHEME

### A.    The Board Repulses a Premium Bid and Decides to Effect a Defensive Repurchase to Save Itself

23.     What follows are the facts relating to the Board's actions rejecting any *bona fide* offer to acquire the Company.  Instead, it engaged in improper defensive maneuvers to entrench the Board in violation of the holding in *Unocal, supra* (the "Unocal Standard"). These improper acts included the wholly needless Defensive Repurchase which wasted $80 million of the Company's funds, and caused harm from which JAKKS may never recover.

24.     On September 13, 2011, Oaktree publicly announced that certain funds and accounts that it managed (the "Oaktree Funds") made a proposal to acquire all outstanding shares of JAKKS common stock for $20 per share in cash, representing a total equity value of approximately $670 million on a fully diluted basis.  The offer represented a 25% premium over the Company's closing stock price as of September 13, 2011, the 30-day average closing price of the Company's stock leading up to September 13, 2011; and the average closing price of the Company's

stock over the preceding 24 months.[3]  Oaktree announced that it made the proposal public after the Board's continued refusal to engage in meaningful discussions about the options available for maximizing shareholder value at JAKKS, including an acquisition by the Oaktree Funds. The Oaktree Funds were then among JAKKS' largest shareholders, with a collective stake at that time of approximately 4.9% of JAKKS common shares.

25.     On October 5, 2011, the Board rejected the Offer.  It does not appear that the Board sought any meaningful negotiations to increase what was already an offer well above JAKKS' recent trading range.   The Board's letter that day to Oaktree stated in relevant part:

October 5, 2011

**VIA E-MAIL AND FEDERAL EXPRESS**
Mr. B. James Ford
Mr. Matthew Wilson
Oaktree Capital Management, L.P
333 South Grand Avenue, 28th floor
Los Angeles, CA 90071

Gentlemen:

I am writing on behalf of the Board of Directors (the "Board") of JAKKS Pacific, Inc. ("JAKKS" or the "Company") in response to your letter dated September 13, 2011, in which you express interest in discussing a "potential going private transaction at $20.00 per share," subject to your ability to conduct due diligence and raise the necessary debt financing.

*****

***The Company Believes its Strategic Plan Will Produce Significantly Greater Value For JAKKS Stockholders Than Your Indication of Interest***

---

[3]    Before Oaktree went public, JAKKS share price last exceeded $20 per share in 2008 and for a brief period in April-May 2011.

This is an exciting time for JAKKS. The Company is in a growth mode that includes several lines of new proprietary products and valuable intellectual property. The Monsuno property is ready for launch as a major televised cartoon series, line of toy products and licensing property, and the Company has entered into key partnerships relating to Monsuno with Nickelodeon, Fremantle, Dentsu and Topps. We believe the Monsuno project and the skill set and key relationships that have been developed to bring it to fruition will lead to similar proprietary projects that should have a positive impact on our share price. In addition, the Company has a number of new and promising proprietary and licensed products, including Baby Watch, Action Cam, Shogami and Winx Club, which could also be transformative and enhance stockholder value. ***Finally, given its cash position, strong balance sheet and market conditions***, the Company believes it is well positioned for continued growth and value creation, including through accretive acquisitions as it has done throughout its history - reinforcing the Board's judgment that execution of its strategic plan will create significantly greater value for the Company's stockholders than your indication of interest.

### Conclusion

I want to emphasize that the Board is committed to increasing the Company's value for all of our stockholders and we are confident that our actions will accrue to the benefit of all of our stockholders, including Oaktree.

Sincerely,
/s/ STEPHEN G. BERMAN

Stephen G. Berman
Chief Executive Officer, President, Secretary and Director

26.     As defendant Berman noted, JAKKS' "cash position" and "strong balance sheet" were key to JAKKS' ability to deliver superior returns.  But when threatened with losing their positions, the Board members destroyed JAKKS' cash position and strong balance sheet, crippling the Company, and rendering it highly unlikely that value in excess of $20 can be achieved.

27.     Given the Board's unwavering pronouncements, one might have expected a blowout 2011 Christmas season, which would serve to verify that the

Board was correct in its assessments.  On December 20, 2011, just weeks after the rejection letter was sent to Oaktree, JAKKS announced that expected 2011 revenues and earnings would fall drastically below projections.  Full year sales were expected to be approximately $660 million, down from the previous estimate of $770 to $775 million. **Analysts were expecting $786.32 million.**  Diluted earnings per share were projected to be $0.37 to $0.40, down from previous guidance of $1.32 to $1.35. **Analysts were currently expecting $1.34.**  On January 25, 2012, research firm Zacks lowered its rating on JAKKS to "underperform-short term strong sell" from "neutral."  The only reason the stock price did not plummet is that hopes of a takeover were still alive.

28.     On February 21, 2012, JAKKS held a conference call and reported that "Net sales for the full year of 2011 were $677.8 million compared to $747.3 million in 2010. Net income reported for the full year period was $8.5 million or $0.32 per diluted share…."  CFO Bennett stated, however, that JAKKS was positioned very well financially and that it had "internally-generated cash flow to support our organic and acquisition growth strategies, maintain a strong balance sheet as well as provide sustainable quarterly dividends to our shareholders."  He further emphasized that: "Our balance sheet remains very strong. We continue to evaluate various uses of our funds and untapped financing capacity. Using our disciplined approach we look for accretive acquisitions to complement the growth of our business and effectively deploy our capital."

29.     On March 5, 2012, JAKKS announced that its Board had unanimously adopted a "poison pill" stockholder rights plan and declared a dividend of one right for each outstanding share of the Company's common stock.  The Board claimed it adopted the rights plan in response to Oaktree's Offer as well as a recent indication by Oaktree that it might accumulate additional shares of the Company's stock in the open market.  The directors claimed that its rights plan was designed to protect against any potential coercive or abusive takeover techniques and to help ensure that

the Company's stockholders were not deprived of the opportunity to realize full and fair value on their investment.  As described below, this was nonsense. The rights plan was adopted to entrench the Board and its adoption for that purpose violated the Unocal Standard.

30.     On March 14, 2012, the Clinton Group, in support of Oaktree's position, publically urged the JAKKS Board to conduct an auction for the Company. While Oaktree did not have a history of engaging in hostile takeovers of public companies, the Clinton Group was altogether different.  Since at least 2008, the Clinton Group had engaged in hostile maneuvers such as proxy contests to oust current management to increase shareholder value.  The Board was painfully aware that the Directors and Officers owned a very small amount of JAKKS shares, that four institutional investors owned approximately 38 percent of JAKKS shares, and that it was likely that smaller institutional investors owned shares in amounts which were likely significant.  The Board also knew that the Clinton Group could easily combine with Oaktree to push a successful proxy contest and end the Board's tenure at JAKKS.  Clinton Group also publicly threatened a proxy contest to either remove JAKKS directors or add additional directors to the Board.  Clinton Group also requested JAKKS' shareholder list for purposes of commencing a consent solicitation.

31.     On April 17, 2012, Oaktree made public a letter it had sent to the JAKKS Board accusing it of entrenching itself, and opining that management had no realistic plan to maximize shareholder value.  The letter stated:

April 17, 2012

The Board of Directors of JAKKS Pacific, Inc.
22619 Pacific Coast Highway
Malibu, CA 90265

Attention: Stephen G. Berman and Murray L. Skala

Dear Messrs. Berman and Skala:

As investment manager to one of the largest shareholders of JAKKS Pacific, Inc. (JAKKS or the Company), we, Oaktree Capital Management, L.P. (Oaktree), remain deeply concerned by the Company's financial performance and strategic direction. In assessing the competency and motives of JAKKS's management team and Board of Directors, shareholders need only review the facts and events of the three-month period between October 2011 and January 2012:

JAKKSs Board of Directors rejects out of hand a $20.00 per share all cash offer by funds managed by Oaktree (Oaktree Funds) as inadequate and proclaims that execution of the Company's strategic plan will provide significantly greater value to the Company's stockholders.

JAKKS management additionally articulates bullish guidance ahead of the critical holiday season and states the Company's strategic plan would generate continued growth and value creation.

Two months hence, JAKKS management reduces its 2011 fiscal guidance for revenue and earnings by $110-$115 million and 70%, respectively. JAKKSs share price declines to $13.39 on January 19, 2012, prior to news reports indicating that Oaktree Funds were likely to make a reduced acquisition proposal.

Company discloses $3.8 million in legal and advisory fees, which represent over 28% of the Company's earnings for the entire fiscal year 2011. In fiscal year 2011, the Company paid a total of $3.4 million in legal fees to the law firm Feder Kaszovitz LLP, for which Mr. Skala, a member of the Company's Board of Directors, is a Partner.

Board installs material golden parachutes that may ultimately cost the shareholders and enrich an underperforming management team.

Based on the actions outlined above, Oaktree has no confidence in the capability and credibility of the current Board and management team. Immediate change is required to preserve and protect the interest of public shareholders.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Oaktree Funds continue to hold the substantial equity stake in the Company of which we advised you previously. We have attempted repeatedly to engage in meaningful discussions with JAKKS management and its Board of Directors and are disappointed that you have continued to resist our efforts to open a constructive dialogue regarding potential value-enhancing transactions, which we believe would be in the best interest of all of the Company's stakeholders.

Since December we have reengaged actively with this Board's advisors seeking a path to acquire JAKKS at a premium valuation. After months of failed commitments and cat and mouse with your legal and financial advisors, representatives of Oaktree and Guggenheim Securities, LLC, our financial advisor, finally were invited to meet with your financial advisors on February 23, 2012. In this meeting we reaffirmed our pressing interest in engaging in an immediate dialogue toward maximization of shareholder value. We outlined our ability to finance and consummate a compelling transaction for shareholders within a 30-day period. On March 5, 2012, the Board and its advisors again formally rebuffed, without basis or rationale, our proposed premium cash acquisition of JAKKS. The JAKKS Board also entrenched itself and management further by unilaterally adopting a poison pill without shareholder vote.

This transaction is of the highest priority for us, and we are prepared to proceed as quickly as possible. In addition to engaging Guggenheim Securities, LLC as financial advisor, we have also engaged MacKenzie Partners, Inc. as proxy solicitors and retained Kirkland & Ellis LLP as legal counsel. We are ready to proceed immediately. With the Company's full cooperation, we can expeditiously (a) complete our confirmatory due diligence, (b) finalize committed debt financing, (c) reach agreements with the JAKKS management with respect to their ongoing roles with the Company, and (d) present to the JAKKS Board a firm acquisition proposal with certainty of close.

We would expect to finance the transaction with a combination of equity and debt. Oaktree has approximately $75 billion of assets under management and the Oaktree Funds can commit 100% of the cash equity required to consummate the transaction. Guggenheim Partners, LLC has over $125 billion in assets under management and

has an active and successful track record of lending to middle-market consumer/retail leveraged buy-out transactions. Guggenheim Corporate Funding, LLC intends to provide the fully committed debt financing required to complete the proposed transaction.

Given that this Board continues to support a management team who has grossly underperformed and continues to resist our efforts to deliver a premium valuation, we believe it is readily apparent that this Board is not willing to act in the best interests of shareholders. It is clear that we are not alone in this view. To that end on March 14, 2012, a major shareholder in JAKKS, Clinton Group, Inc. (Clinton), openly called for the Board to undertake a review of its strategic options and embark on a targeted auction process. Their letter continued that Clinton was dismayed at the Board's decision to adopt a poison pill and expects that its fiduciaries on the Board will permit any interested buyer to bring their proposal directly to the shareholders, who can decide for themselves whether they would prefer to remain invested in an independent JAKKS or would rather take the proposed offer. We share the views Clinton has expressed in their public disclosures and support Clinton's stated intention to solicit action by written consent.

We are hopeful that the Board will finally act in the interest of shareholders and immediately begin a process to explore alternatives to maximize shareholder value. Absent that, replacing this entrenched Board with new directors who will act in shareholders' best interests is paramount. Given the Company's rapidly deteriorating financial performance and damaged credibility amongst key constituents, we are concerned that further delay in initiating a strategic process will only risk further destruction of shareholder value. If the Board chooses not to pursue this path, please know that we are committed to protecting the value of our investment and, consequently, we are prepared to pursue any and all actions available to us in order to ensure that the JAKKS Board actively and thoughtfully pursues alternatives to maximize value for shareholders.

Sincerely,

_____
B. James Ford
Managing Director
Portfolio Manager, Global Principal Group

_____

Matthew Wilson
Managing Director

32.     Defendant Berman quickly responded, rejecting Oaktree's position.

33.     Despite the war of words with Oaktree, the real threat was the Clinton Group.   To entrench itself, the JAKKS Board therefore badly needed to mollify the Clinton Group in a manner short of a proxy fight, which it could easily lose.   Thus, the JAKKS Board resolved to negotiate a standstill with the Clinton Group. In essence, what the Board determined to do *was to indirectly pay Clinton Group to allow it to stay in office.*

34.     On April 18, 2012, JAKKS reported its financial results for the first quarter, ending March 31, 2012.  It stated:  "Net sales for the first quarter of 2012 were $73.4 million, up from  $72.3 million reported in the comparable period in 2011. The reported net loss for the first quarter was $16.0 million, or $0.62 per diluted share, which includes $1.4 million, or $0.03 per diluted share, related to financial and legal advisory fees and expenses. This compares to net loss of $10.6 million, or $0.39 per diluted share, reported  in the comparable period in 2011, which included $0.3 million, or $0.01 per diluted share, of financial and legal advisory fees and expenses."

35.     On an April 18, 2012 conference call, defendant Berman reiterated that an important part of JAKKS' financial plan was its ability to deploy its large cash position to expand.  He stated: "we have been meeting often with our Board and our Board is reviewing many different alternatives with the capital base. One of our first and foremost strategic parts of our business has always been acquiring licenses, expanding international, and acquiring accretive acquisitions."

36.     On April 23, 2012 the directors revealed that they had decided, as part of an April 22, 2012 Standstill Agreement, to assuage the Clinton Group by repurchasing at least *$80 million* worth of JAKKS shares (the "Defensive

Repurchase") and increasing the size of the Board.  The share buyback would be worth at least $20 a share, representing a 14% premium to stock prices that reflected the hope that JAKKS would be taken over.  The Company agreed to add two members to its Board, for a total of eight.  The Standstill Agreement provided that the Defensive Repurchase could be delayed but not terminated, even if the Board, exercising its fiduciary duty would have been obligated to do so.  The omission of a fiduciary out clause or a MAC Clause is further evidence that the Standstill Agreement was for the benefit of the Board and not the Company or its shareholders.

37.     In exchange, Clinton Group agreed to certain standstill restrictions until 60 days before the Company's December 2013 annual meeting, and to vote for the Company's slate of board nominees at the upcoming annual meeting.  To fulfill the Standstill Agreement, defendants Brodsky and Reilly joined the Board. In order to fund the Defensive Repurchase JAKKS was required to incur substantial debt. As part of the Standstill Agreement, JAKKS was required to negotiate with Oaktree in good faith.

38.     The Board approved and commenced the Repurchase on or about May 25, 2012. On June 28, 2012, the Company announced the preliminary results of the Defensive Repurchase. The Company expected to accept for payment an aggregate of 4 million shares at a purchase price of $20 per share, for a total purchase price of $80 million. The 4 million shares bought back in the Defensive Repurchase, which closed on July 5, 2012, represented approximately 15.4% of the Company's shares outstanding as of May 24, 2012.

39.     The Defensive Repurchase had no positive effect on JAKKS' share price.  Rather than increasing JAKKS' share price above the $20 per share Oaktree Offer, JAKKS' share price steadily declined thereafter. Indeed, on June 28, 2012, the stock closed at $15.61 per share, and fell to $12.35 per share by the end of 2012.

40.      Following the Defensive Repurchase, poor results soon began to be reported.   These results are attributable, wholly or in major part, to the adverse effects of the Defensive Repurchase.

41.      The financial results for the quarter ended June 30, 2012 (announced on July 17, 2012) were lackluster.   The net loss for the first six months of 2012, adjusted for legal fees, was $13.5 million, up from a loss of $5.6 million for the first six months of 2011.   At the time the Defensive Repurchase at $20 per share was launched and closed, defendants could not know that results for the quarter would reflect significant improvement or justify management's pronouncements.   Rather, the motivation was to neutralize Clinton Group.   As news service Benzinga.com reported that day: "Jakks Pacific's quarterly profit declined to $214,000, or a penny per share, versus $4.2 million, or $0.16 per share, in the year-ago period. Excluding items, its adjusted earnings came in at $0.06 per share. Its net sales climbed 10% to $145.4 million. *However, analysts were expecting a profit of $0.11 per share on revenue of $137 million*...Jakks Pacific shares closed at $15.81 yesterday.*"*

42.      On August 13, 2012 Oaktree wrote to JAKKS expressing its final effort to open negotiations.   It advised JAKKS that it had sold its stake in JAKKS and thus posed no threat to JAKKS.   However, it remained very interested in doing a transaction with JAKKS.   Oaktree advised that it was willing to enter into a non-disclosure agreement containing terms that it believed are reasonable and customary and had sent to representatives of JAKKS various draft agreements containing such terms.   Although Oaktree continued to believe those terms were reasonable and customary, Oaktree was prepared to make substantial concessions on the points remaining open in the last markup from JAKKS, if JAKKS would provide immediate access to the due diligence information that Oaktree required to deliver a definitive proposal to the JAKKS Board that was in the best interest of all of the JAKKS shareholders.

43.     JAKKS refused even to negotiate with Oaktree, even though such negotiations would have been in the best interests of the JAKKS shareholders and JAKKS had agreed in the Standstill Agreement to negotiate with Oaktree in good faith, creating a duty and obligation to provide due diligence and negotiate in earnest.  In derogation of these duties, the Board refused to cooperate with Oaktree in any manner.

44.     Within weeks of the July 5, 2012 close of the Defensive Repurchase, JAKKS revised its earnings downward.  On September 28, 2012 the Dow Jones Newswire reported:

> Jakks Pacific Inc. (JAKK) lowered its full-year guidance as the toy maker said it experienced "disappointing" domestic product sales and a slowdown in orders, as well as increased expenses. Shares were down 8.9% at $13.27 in after-hours trading.
>
> The company now expects adjusted earnings of about **_68 cents to 74 cents_** a share and revenue of $690 million to $700 million. Its prior view called for a profit of **_$1.04 to $1.08 a share_** and revenue between $720 million and $728 million.
>
> Jakks said it will take a one-time non-cash charge of $3.45 a share for impairment of its domestic deferred tax assets if it doesn't achieve meet at least the top-end of its new earnings projection.
>
> The maker of Pokemon, Monsuno, Winx and Hello Kitty toys in July notched two consecutive quarters of sales growth after 2011's top line slid 9.3%. However, its second-quarter profit slumped 95% on higher legal advisory fees and lower income from a video game joint venture.
>
> Jakks has touted an early favorable response to the launch of Monsuno action figures, the first line the company launched in which it also owns the entertainment content. Monsuno figures are tied to a character-based storyline featured on an animated television show that debuted in February.

The stock is off 24% over the past 12 months.

45.     Investors reacted angrily.  JAKKS had pegged its prospects on the Monsuno line of toys, but these were low-tech gadgets, and were tied to a Nickelodeon show which had met a mediocre reception.  Moreover, Nickelodeon itself was experiencing a steep decline in ratings, a decline that was evident at the time the Standstill Agreement was entered.  On an October 23, 2012 conference call JAKKS convened to discuss its third quarter, Jonathan Fite of KMS Investments summarized his company's grievances:

> We have been shareholders of JAKKS for several years now, and given our tenure, just bear with me for a moment.
>
> ***
>
> [A]bout 18 months ago, you began touting the wondrous prospects of Monsuno, but these failed to deliver. You've severely missed earnings projections in 2011, and you've lowered expectations again for 2012.
>
> Most recently, you refuse to negotiate in good faith with a firm willing to offer shareholders $20-plus, but instead you decided to spend shareholder money on a tender at the same price. Since that tender took place, you've weakened the balance sheet and presented over a 30% drop in the share price. Yet you've had your compensation contract renewed at pretty substantial levels.
>
> So can you explain to me why you might deserve to have that contract renewed and why you think your capital allocation record over the past three years really deserves to be rewarded?

46.     Berman refused to directly address Fite's concerns, to which Fite responded*: "it seems that you have taken an approach of doing things that keep you and your management team in place, earning a really nice salary, but do that at the expense of shareholders…"*

47.     On that same call, Berman admitted that Nickelodeon's plummeting popularity had affected Monsuno sales:

[W]e've spent a good amount of marketing dollars and have it on Nick Tunes. ***The viewership of Nickelodeon itself or Nick Tunes has dropped last year, as well it's dropped significantly over the last two years, so we're not getting the retention of the boys here.*** So it's more working based off of advertising. So while it's extremely growing on a rapid basis all overseas, it's doing well here, but not as to what we expected..."

48.     JAKKS shares closed on October 23, 2012 at a price of $12.70 per share, 36.5% below the June 2012 repurchase price.

49.     The financial damage inflicted on JAKKS did not end with the $80 million wasted on the Defensive Repurchase.  The 2012 fiscal year ended with a loss of a staggering $104 million, including $119.5 million in the fourth quarter alone.  Defendant Berman announced in a February 13, 2013 conference call that the once-flush JAKKS was now forced to keep a "tight rein" on expenses. JAKKS was forced to close its New York office, and move one division back to headquarters. Roughly 10% of the employees were fired.

50.     On July 17, 2013, deeply disappointing second quarter results were announced, including a $46.9 million net loss.  Defendant Berman stated that "we are undertaking several initiatives to return the company to profitability and growth, including a suspension of our quarterly dividends and a deep restructuring plan designed to reduce operating costs."

51.     On July 19, 2013 JAKKS announced that it was forced to make a $100 convertible note offering (the "Convertible Note Offering"), at a conversion price that was so low that it would be highly dilutive should JAKKS return to profitability and would serve as a severe drag on JAKKS's shares climbing anywhere near $20 per share.  JAKKS announced:

"JAKKS Pacific, Inc. (JAKK) today announced the pricing of $100 million principal amount of 4.25% convertible senior notes due 2018 (the "notes"). The notes are senior unsecured obligations of JAKKS, will pay interest semi-annually at a rate

of 4.25% per annum and will mature on August 1, 2018. The conversion rate will initially be 114.3674 shares of JAKKS common stock per $1,000 principal amount of notes (*equivalent to an initial conversion price of approximately $8.74 per share of common stock*), subject to adjustment in certain circumstances

52.     In other words, Convertible Note investors would not just get $4.25 million in interest per year, but for five years would have the right, upon conversion, to obtain shares at a price of only $8.74 a year, 56% below the $20 price JAKKS rejected just a year earlier. If all Convertible Notes are converted into shares, JAKKS will need to issue 11.43 million shares, increasing its share base from the current roughly 22 million shares to over 33 million shares, making a significant profit per share much harder to achieve.  Had the entrenching Defensive Repurchase not occurred just one year prior, JAKKS would not have been compelled to sell the Convertible Notes on such poor terms.

**B.     The Board's Actions Were Designed to Entrench It**

53.     The JAKKS Board claimed that if JAKKS stayed independent it would create greater shareholder value.  Whatever business plan JAKKS had, it was destroyed by the Defensive Repurchase and its economic fallout.  Indeed, even before the Defensive Repurchase, JAKKS had a history of failing to meet its own guidance, reflecting its inability to forecast accurately in this market.  To the extent that JAKKS' strategic plan hinged on leveraging its strong balance sheet to make acquisitions, increase marketing, and add product lines, that strong balance sheet was destroyed by the Defensive Repurchase, the Convertible Note Offering ,and other ill effects of the  Board's entrenching actions.

a.     On December 16, 2011, JAKKS was forced to reveal its sales performance was disappointing during the important holiday season, and this had resulted in higher markdown allowances and higher royalty expenses relating to license guarantee shortfalls.  The Company announced anticipated

net sales for the full year 2011 of approximately $660 million, with diluted earnings per share in the range of $0.37 to $0.40, excluding non-recurring financial and legal advisory charges. This was a very substantial reduction from the Company's previously anticipated full year 2011 net sales of approximately $770 million to $775 million, with diluted earnings per share in the range of $1.32 to $1.35, excluding such one-time charges;

b.     On February 21, 2012, JAKKS announced guidance for 2012 including an increase in net sales of 6.2% to 7.4% to approximately $720 million to $728 million, with diluted earnings per share in the range of approximately $1.01 to $1.07, excluding any financial and legal advisory fees. This guidance anticipated first-quarter 2012 net sales in the range of $63 to $70 million, with a loss per share in the range of $0.61 to $0.64;

c.     The 2012 forecast was heavily reliant on the success of the Monsuno product line which, in turn, was heavily reliant on the success of Nickelodeon, which broadcast the Monsuno animated shows. But, in March 2012, it was revealed that Nick had for the first time ever fallen to second place in ratings to Disney, and that its ratings were in free-fall, dropping 31% year over year. The directors did not revise projections based on this development.

d.     By September 28, 2012, with Clinton Group neutralized, the Company lowered 2012 guidance as a result of claimed disappointing domestic product sales and a slow-down in product orders, coupled with higher expenses, including marketing and advertising expense commitments and minimum license royalty guarantees. The Company announced that it anticipated net sales for the full year of approximately $690 million to $700 million, with revised non-GAAP earnings per share in the range of approximately $0.68 to $0.74. Berman conceded on the October 2012 conference call that there was a correlation between poor Nickelodeon ratings

and Monsuno sales.  His remarks contain a concession that this situation was no surprise to him personally;

e.      On February 21, 2013 JAKKS reported results for the Company's fourth quarter and full year ended December 31, 2012.  Net sales for the fourth quarter of 2012 were $133.5 million, compared to $141.1 million reported in the comparable period in 2011.  The reported net loss for the fourth quarter was $119.5 million, or $5.45 per diluted share, which included a one-time non-cash charge of $91.7 million or $4.18 per diluted share, related to the impairment of deferred tax assets, and $0.8 million of pre-tax charges, or $0.03 per diluted share, related to legal and financial advisory fees and expenses associated with the unsolicited indication of interest and activist shareholder activities. Defendant Berman stated, "We are disappointed by our performance in the fourth quarter. The difficult and challenging toy environment did not generate the sales that had been anticipated, and several of our key products did not achieve the sales levels that we had planned for, also resulting in license royalty minimum guarantee shortfalls. However, we are optimistic for our future growth and profitability. We believe that our core business lead by our infant/preschool, seasonal and Halloween segments, in conjunction with meaningful reductions in operating costs, will return the Company to profitability in 2013." Berman continued, "We believe that the difficult environment for toys in 2012 resulted from rapid changes in children's play patterns as tablet and smartphone devices and interactive games and toys have more and more become cornerstones of their play and fun experiences.  We recognize that it is critical for us to provide new, more exciting and magical experiences for today's child compatible with these new play patterns. We believe that our partnership with NantWorks in creating our DreamPlay line of toys using NantWorks proprietary ID recognition technology will place JAKKS in the

forefront of the play revolution we are witnessing.  We believe that applying this technology to a broad array of characters and play patterns will create new consumer demand for JAKKS products and will help JAKKS achieve substantial long range growth and profitability, warranting the investment in technology and content that we are making;"

f.      At the same time, the Company announced 2013 guidance foreseeing an increase in net sales of 4.0% to 5.0% to approximately $694 million to $700 million, with diluted earnings per share in the range of approximately $0.63 to $0.68.  This guidance anticipated first-quarter 2013 net sales in the range of $70 to $73 million, with a loss per share in the range of $0.83 to $0.85, which reflects 17.6% fewer common shares outstanding primarily as a result of the July 2012 Defensive Repurchase;

g.      On July 17, 2013, JAKKS announced its second Quarter 2013 results. Net sales for the second quarter of 2013 were $106.2 million compared to net sales of $145.4 million reported in the comparable period in 2012.  The reported net loss for the second quarter was $46.9 million, or $2.14 per diluted share, which included charges for license minimum guarantee shortfalls of $14.1 million and inventory impairment of $12.2 million. This compared to net income of $0.2 million, or $0.01 per diluted share, reported in the comparable period in 2012, which included $1.7 million, or $0.5 per diluted share, of legal and financial advisory fees and expenses related to the 2011 unsolicited indication of interest.  Net sales for the six months ending June 30, 2013, were $184.3 million compared to $218.8 million in 2012.  The net loss reported for the six month period was $74.4 million, or $3.40 per diluted share, which includes $0.8 million, or $0.03 per diluted share, of pre-tax financial and legal advisory fees and expenses relating to the 2011 unsolicited indication of interest, and charges for license minimum guarantee shortfalls of $14.4 million and inventory

impairment of $14.9 million. This compared to a net loss for the first six months of 2012 of $15.8 million, or $0.61 per diluted share, which included $3.1 million, or $0.09 per diluted share, of pre-tax financial and legal advisory fees and expenses. Defendant Berman stated, "We are disappointed that JAKKS has not met its second quarter target and will not achieve its full year 2013 forecast. Sales for the second quarter were significantly below expectations due to a variety of factors. Several retailers, both in the United States and in Europe, are struggling and have substantially decreased their orders. In addition, the poor performance of several of our key properties, including Monsuno and the Winx Club, also contributed to the decline, along with unusually cool weather that affected seasonal toy sales leading to more aggressive markdowns at retail as shelves are cleared for back-to-school products. We also believe the decline in sales reflects the continuing change in play patterns of children of all ages, who continue to rely more and more on smart devices for their fun and entertainment. As previously announced, this shift in play patterns has caused companies like JAKKS to evolve to meet the changing demands of its consumers with technologically enhanced product offerings."   Berman further stated "We are making key, targeted moves to align operations, drive productivity and support innovation with the objective of returning the Company to profitability in 2014. We believe that JAKKS, which has now been in business for almost 18 years, will be able to weather the seismic shift that the toy industry is experiencing due in large part to our commitment to growing a segment of our portfolio that combines the power of digital content with physical product, such as our innovative DreamPlay line of toy products. These initiatives should be seen in this strategic context as we continue to reshape our business to improve innovation and product sales and with it our long-term ability to compete in a rapidly changing industry. Coupled with our

core, evergreen business, we expect that JAKKS will be able to solidify its position in 2014 and beyond as one of the leading toy companies in the United States;" and

      h.    At the same time as the Second Quarter earnings announcement JAKKS was forced to revise downward its full year 2013 guidance. It was announced that the Company anticipated net sales for the full year of approximately $620.0 million, with revised loss per share in the range of approximately $56.1 million, or $2.56 per diluted share. The revised guidance represented a reduction from the Company's previously anticipated full year net sales of approximately $694 million to $700 million and diluted earnings per share in the range of approximately $0.63 to $0.68, excluding financial and legal advisory fees relating to the 2011 unsolicited indication of interest.

54.    From the time that the Defensive Repurchase was announced, JAKKS shares have never approached $20 per share. Indeed, the Defensive Repurchase was so over-subscribed that JAKKS was only able to purchase approximately 15% of the over 22 million shares tendered. Indeed, a buy-out at $20 per share or above would have received widespread shareholder support. As it was, when the preliminary results of the Defensive Repurchase were announced, JAKKS shares closed at a price of $15.61.

55.    Given the weaknesses in JAKKS' business over the long term as known by the Board and management its share price has not provided any significant gains for long-term shareholders. The very competitive toy market and JAKKS' apparent inability to thrive in that market certainly signaled to anyone taking a disinterested look that a buy-out of this Company at $20 per share or more was certainly in the best interests of the shareholders. The Defensive Repurchase, the Poison-Pill, the Standstill Agreement, the refusal to negotiate with Oaktree and the repeated dissemination of financial guidance which indicated that success was just around the corner, but which success never materialized, and the DreamPlay

Joint Ventures, all reflect the Board's breach of its fiduciary duty to act in the best interest of JAKKS and not in their own narrow financial self-interest. JAKKS shares have recently traded between $6-8 per share, a difference of roughly 60% from the Offer. *Working capital declined from $375 million at the end of 2011 to $120 million as of March 31, 2014.* The Board's decisions were self-interested and not a valid exercise of business judgment. Accordingly, the Defendants should be held liable to the Company for all damages flowing from their breaches of fiduciary duty, including their violation of the Unocal Standard.

### C.   The Director Defendants Cause JAKKS to Repurchase Shares and Adopt the SRA as a Means of Entrenchment

56.   In effecting the Defensive Repurchase and adopting the SRA, the Repurchase Defendants injured JAKKS by forcing it to repurchase shares at $20, which price was not reflective of fair value, and which cost $80 million JAKKS could not spare. The SRA, coupled with the Board's refusal to negotiate with Oaktree in good faith, also prohibited Oaktree from pursuing its buyout offer.

57.   Much of JAKKS' cash as reflected on its balance sheet was held abroad in Hong Kong and not available to be used for domestic business purposes. After the Defensive Repurchase, JAKKS did not have sufficient domestic cash to support its 2012 business goals, including the promotion of existing products, and the development of high tech competitive products.

58.   JAKKS was forced to borrow funds to affect the Defensive Repurchase.

59.   As a result, the Director Defendants severely weakened JAKKS balance sheet and made it impossible for JAKKS to effect its business plans as it lacked the necessary financial resources.

60.   Moreover, the success of JAKKS' Monsuno product line was tied largely to the success of Nickelodeon, and its ability to stanch its ratings slide. The Defendants knew of this relationship (and its effect on sell-through and marketing

costs) at the time the Defensive Repurchase was agreed upon and effectuated.

61.     Thus, as Berman was forced to admit in the October 2012 Analysts' Conference, JAKKS has been constrained in promoting its products by its lack of financial resources.  Monsuno products, which track the airing of the Monsuno TV cartoon program on the Nickelodeon network, are geared to boys.  Yet Nickelodeon captures more girl viewers than boys and its overall viewer market share is declining.  Monsuno product sales have been weak in the United States due to the Company's inability to properly advertise and promote the products.  Thus, the purported business plan was and/or became unrealistic due to the lack of JAKK's domestic financial resources.

62.     *Unocal* places the burden on directors who take actions that are entrenching to justify their conduct. It requires that directors who take defensive action against a hostile takeover show (i) that "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and (ii) that the response selected was "reasonable in relation to the threat posed." *Unocal,* 493 A.2d at 955   Defendants cannot show this, and thus violated the Unocal Standard and are liable for all of the financial harm caused JAKKS.  *See also, Bennett v. Propp,* Del. Supr., 41 Del. Ch. 14, 187 A.2d 405, 409 (1962)("We must bear in mind the inherent danger in the purchase of shares with corporate funds to remove a threat to corporate policy when a threat to control is involved. The directors are of necessity confronted with a conflict of interest, and an objective decision is difficult.").

## II.   DERIVATIVE DEMAND ALLEGATIONS

63.     Plaintiff brings this action as a derivative action on behalf of and for the benefit of JAKKS.

64.     Plaintiff will fairly and adequately represent the interests of JAKKS in enforcing and prosecuting its rights, and has retained competent counsel

experienced in this type of litigation.

65.     Demand on the JAKKS Board to bring this action was not been made and is excused because such demand would be have been futile.  Under Delaware law, demand futility is measured as of the time of the filing of the original derivative complaint. The "Relevant Board" is the Board that was in office at the time the filing of such complaint.  This derivative action was originally interposed in federal Court, and the Board at the time of that federal filing remains the relevant Board for demand purposes. A majority of Board members then in office approved the SRA and the Defensive Repurchase.  Berman, Glick, Miller, Skala were on the JAKKS Board at the time of the filing of the initial derivative complaint in this Court on behalf of JAKKS, and comprised a majority of the Board: four of its six members. Berman, Glick, Miller, and Skala approved the Defensive Repurchase. Reilly thereafter ratified it and effectuated it as a director.

66.     Berman, Glick, Miller, Reilly and Skala breached their duty of loyalty as to the faithful executive of the Standstill Agreement, refusing to provide Oaktree with due diligence or engage in good faith negotiations, as required.

67.     Alternatively, should the current Board as of the time of this filing be deemed the relevant Board for demand purposes, the current JAKKS Board consists of the six Directors, including Defendants Stephen G. Berman,  Murray L. Skala and Peter F. Reilly.  Demand is found futile if a reasonable doubt has been raised that at least half the Board members could not independently consider a demand to take legal action. As to the current Board, half of the current Board—Defendants Berman, Skala and Reilly--was involved in the approval and/or the effectuation of the Defensive Repurchase, and the breach of the Standstill Agreement obligations owed to JAKKS.  As such there was no independent Board as to this wrongdoing and demand is excused.

68.     Under Delaware jurisprudence, whether a plaintiff has stated a *Unocal* claim is judged under lenient Rule 12(b) (6) standards.  If such a claim

is stated, then demand is considered excused, as a Board that is facing colorable claims of entrenchment has the burden of disproving the allegations, and cannot be considered to be independent or to have acted with reasonable business judgment. *See e.g., In re Gaylord Container Corporation Shareholders Litigation*, 747 A.2d 71, 81 (Del. Ch. 1999)("So long as the plaintiff states a claim implicating the heightened scrutiny required by *Unocal*, demand has been excused under the *Aronson v. Lewis* demand excusal test.").

### A.   Demand Is Excused For Futility As To The Defensive Repurchase And SRA Related *Unocal* Claims

69.     All previous allegations are incorporated by reference herein.

70.     Demand on the JAKKS Board to bring this action has not been made as to the Defensive Repurchase claims and is excused because such demand would be futile.  Defendants Berman, Glick, Miller, and Skala, a majority of the relevant Board members, were Board members at the time the Board approved the Defensive Repurchase. Reilly thereafter ratified and effectuated it as a director. Additionally, the SRA remained in place at the time each of these directors served in office.

71.     The Oaktree and Clinton Group overtures were made when JAKKS was losing money, had repeatedly missed projections, had no well-defined plan to completely change the Company's fortunes, and faced growing competition from much better financed competitors. The "threat" presented, an offer at $20 per share at more, was no threat at all, but rather a golden opportunity to rescue a company that was--and would continue to be--at a severe competitive disadvantage.

72.     Instead of informing themselves as to how high an offer they could get for JAKKS, the Board stonewalled the bidders.  When a potential bidder appeared on the scene that had a history of conducting hostile proxy fights, Clinton Group, the Board completely wrecked JAKKS' balance sheet through a

1   disastrous $80 million stock buyback.  Huge debt had to be incurred; operations

2   soon needed to be cut back; advertising and development funds were limited;

3   and a $100 million Convertible Note Offering was undertaken at a conversion

4   price that will severely hamper JAKKS as a Company and severely depress

5   JAKKS' stock price.

6       73.     The actions of the Board in hobbling JAKKS financially in order to

7   "save it" from premium bids were patently reckless, and cannot meet the test of

8   reasonable business judgment.  Demand is therefore excused.

9                        **FIRST CLAIM FOR RELIEF**

10      (Derivatively Against Defendants Berman, Miller, Skala, Glick, Ellin, Reilly,

11   Brodsky and Almagor for Breaches of Fiduciary Duty, Including *Unocal* Violations)

12      74.     Plaintiff repeats and realleges all previous allegations, set forth above,

13   as if fully set forth herein.

14      75.     The Defendants, as Directors, had a duty to act with loyalty toward

15   JAKKS, and in its best interests, and with the utmost good faith.

16      76.     The Defendants had the obligation not to oppose acquisition interest in

17   the Company unless such opposition was in utmost good faith and to the benefit of

18   the Company and its shareholders.

19      77.     That was not the case here.  JAKKS had no viable and superior plan for

20   increasing shareholder value, and that the best interests of the Company were not

21   served by rebuffing Oaktree's $20 offer.

22      78.     Rather, in order to entrench themselves, and avoid a proxy contest in

23   which a combined effort of Oaktree and Clinton Group would likely unseat them,

24   the Defendants determined to effectuate the Defensive Repurchase, which was

25   approved so as to pay Clinton Group a premium price not to unseat them.  To use

26   corporate funds to effect entrenchment is unreasonable misconduct.  Moreover, it

27   was plain that the Defensive Repurchase would inflict severe and enduring financial

28   damage upon the Company, and work to prevent it from returning superior value to

shareholders.  Damages related to the Defensive Repurchase must be paid by the directors who approved it and/or effectuated it, the Repurchase Defendants (defendants Almagor, Berman, Ellin, Glick, Miller and Skala).

79.     As to the disloyal failure to abide by the Standstill Agreement, JAKKS has been damages, and the directors in office at the time of these wrongful act are liable therefore, such directors being Almagor, Berman, Brodsky, Ellin, Glick, Miller, Reilly and Skala.  The Standstill Agreement, as to those terms which address Oaktree, was entered into not for the benefit of the directors, or any particular shareholder, but to advance the interest of JAKKS, giving JAKKS the right to seek redress for the disloyal, bad faith frustration of these terms by these directors.

80.     For the foregoing reasons, the Defendants named as specified are liable to JAKKS for all damages suffered as a result of the violation of the *Unocal* standard, including harms flowing from the Defensive Repurchase, the employment of the SRA, and the violation of the Standstill Agreement.

## DEMAND FOR TRIAL BY JURY

To the full extent available, Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment as follows:

A.     Awarding compensatory damages in favor of the Company against the Individual Defendants, for all damages sustained by the Company as a result of defendants' wrongful acts and misconduct as alleged herein;

B.     Awarding the Company prejudgment and post-judgment interest, and awarding Plaintiff and its counsel as well as their reasonable attorneys' fees, expert fees and other costs; and

//

1         C.    Awarding such other and further relief as this Court may deem just and

2    proper.

3    DATED: March 19, 2015                LAW OFFICES OF DAVID N. LAKE

4

5                                    By:       /s/
6                                         DAVID N. LAKE
                                     Liaison Counsel for Plaintiffs
7    Laurence D. Paskowitz, Esq.
**THE PASKOWITZ LAW FIRM P.C.**
8    208 East 51st Street, Suite 380
New York, New York 10022
9    212- 685-0969
10   212-685-2306 (fax)
classattorney@aol.com
11

12   Jeffrey C. Block, Esq.
Joel Fleming, Esq.
13   **BLOCK & LEVITON, LLP**
14   155 Federal Street
Boston, MA 02110
15   (617) 398-5600
16   jeff@blockesq.com
joel@blockesq.com
17

18   OF COUNSEL:
19   Roy L. Jacobs, Esq.
**ROY JACOBS & ASSOCIATES**
20   420 Lexington Avenue  Suite 2440
New York, NY 10170
21   212- 867-1156
22   212-504-8343 (Fax)
rjacobs@jacobsclasslaw.com
23

24   Richard A. Maniskas, Esq.
**RYAN & MANISKAS, LLP**
25   995 Old Eagle School Road, Suite 311
26   Wayne, PA  19087
484-588-5516
27   484-450-2582 (Fax)
rmaniskas@rmclasslaw.com
28

## VERIFICATION

I, Vladimir Gusinsky, am the Trustee of the Vladimir Gusinsky Living Trust.  I verify and declare that I have reviewed the Verified Shareholder Derivative Complaint in this action captioned Vladimir Gusinsky Living Trust v. Stephan Berman, et al. (the "Complaint"). The allegations contained within the Complaint are true and correct to the best of my knowledge, information and belief. I have also authorized the filing of this Complaint.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: January 22, 2015

Vladimir Gusinsky, Trustee for
Vladimir Gusinsky Living Trust